IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>EDWARD EARL STEPHENSON,<br><br>    Defendant. | 3:05-CR-00511<br><br><br>ORDER GRANTING<br>COMPASSIONATE RELEASE |

Before the Court is Defendant Edward Earl Stephenson's pro se Motion for Compassionate Release filed on April 17, 2020. ECF No. 157. The Government filed its response on April 20. ECF No. 158. Per the Southern District of Iowa's Administrative Order No. 20-AO-9-P, the Federal Public Defender entered an appearance and filed a supplemental brief in favor of release on May 5. ECF No. 165. The Government then filed a response, as the Administrative Order permits, on May 18. ECF No. 167. The matter is fully submitted.

I.  BACKGROUND

In 2005, Defendant pleaded guilty to one count of conspiracy to distribute and manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. ECF No. 53. Given his prior drug conviction and then-controlling statute, he faced a mandatory minimum of twenty years imprisonment. ECF 166 ¶ 106. The Court sentenced him to 270 months imprisonment and ten years of supervised release. ECF No. 114

Defendant has done about as well as one can while incarcerated. He earned an associate degree from Indiana State University and obtained job skills from prison work along with "satisfactory or higher work performance reports." ECF No. 157-1 at 1–2. He also "has been very active" in Federal Bureau of Prisons (BOP) programming, including a 500-hour Residential

Drug Abuse Program that would have led to a sentence reduction but for Defendant's specific offense conduct.  ECF No. 157-1 at 2; ECF No. 165 at 13.  His BOP records show no disciplinary violations.  ECF No. 157-1 at 2.

Today, Defendant is held at FMC Rochester, the Minnesota medical facility for federal prisoners.  ECF No. 157.  At the time of sentencing, the Court was aware Defendant was diagnosed with hepatitis C.  *See* ECF No. 166 ¶ 83; ECF No. 167 at 6.  The Court, however, was not aware of how hepatitis C weakens one's immune system, Trinity Coll. Dublin, *How Hepatitis C 'Ghosts' Our Immune System*, Science Daily (June 5, 2019), https://www.sciencedaily.com/releases/2019/06/190605105940.htm, and that this weakness may continue even after one has been "cured," Benedikt Strunz et al., *Chronic Hepatitis C Virus Infection Irreversibly Impacts Human Natural Killer Cell Repertoire*, 9 Nature Comm. 2275 (2018), https://www.nature.com/articles/s41467-018-04685-9; *see also Immune System Does Not Recover Despite Cured Hepatitis C Infection*, Karolinska Inst. (June 11, 2018), https://news.ki.se/immune-system-does-not-recover-despite-cured-hepatitis-c-infection.

The Court also was not aware that fifteen years into Defendant's incarceration the world would be consumed by a global pandemic.  In two months, the virus known as COVID-19 has killed more than 93,000 Americans and infected at least 1.55 million.  *Mortality Analysis*, Johns Hopkins U. & Med. (May 21, 2020, 5:46 AM), https://coronavirus.jhu.edu/data/mortality.  We shut down courts, schools, churches, theaters, "non-essential" businesses, and Major League Baseball—places where there are too many people and too little space to keep the virus from spreading through air and surfaces.  That also sounds a lot like federal prison.  Already "tinderboxes for infectious disease," prisons now are even more dangerous than we typically

accept.  *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).

At least 2265 prisoners and 188 BOP staff, including one at Defendant's facility, tested positive for the virus.  *COVID-19 Cases*, Fed. Bureau Prisons (May 21, 2020), https://www.bop.gov/coronavirus/.  Fifty-eight of those inmates have died.  *Id.*  But it is hard to compare these numbers to those for the nation at large.  First, as the Federal Public Defender notes—and the Court has noticed—the BOP case count appears to fluctuate both up and down because it only includes "open" cases.  *See* ECF No. 165 at 10 n.4; *COVID-19 Cases*, Fed. Bureau Prisons (May 21, 2020), https://www.bop.gov/coronavirus/ (noting BOP "positive test numbers are based on the most recently available *confirmed lab results* involving *open cases*"); Christian Boone, *Employee's Death Raises Questions About Conditions Inside Federal Pen*, Atlanta J. Const. (May 4, 2020), https://www.ajc.com/news/local/employee-death-raises-questions-about-conditions-inside-federal-pen/3Enh61w6Di8rcT9YuY5PPK/ (quoting BOP spokesperson as saying "[t]he total number of open, positive test, COVID-19 cases fluctuates up and down").  And second, it remains unclear how likely BOP is to test an inmate at all.  *See BOP Expands COVID-19 Testing: Rapid Testing Available at Select Facilities*, Fed. Bureau Prisons (April 24, 2020, 1:00 PM), https://www.bop.gov/resources/news/20200424_expanded_testing.jsp (describing testing of asymptomatic patients at "select facilities").

The BOP indeed faces a daunting task.  It has undertaken emergency measures to halt the virus's spread*.  BOP Implementing Modified Operations*, Fed. Bureau Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 20, 2020).  Social visits are cancelled, prisoner movement is limited, and legal visits are suspended subject to exception.

*Id.* At the same turn, it is unclear what the future holds as states relax restrictions on free residents, including BOP employees.

The Attorney General has directed BOP to consider increased use of home confinement for at-risk inmates. Memorandum from U.S. Att'y Gen. William Barr to Dir. of Bureau of Prisons (Mar. 26, 2020). Defendant did not receive such a recommendation. Meanwhile, his wife battles her own liver complications, and his adult son requires support for autism. ECF No. 165 at 14–15.

## II. ANALYSIS

The First Step Act amended numerous provisions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration. Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019). Congress designed the provision at issue here, § 3582(c)(1)(A), for "Increasing the Use and Transparency of Compassionate Release." § 603(b), 132 Stat. at 5239. Section 3582(c)(1)(A) allows defendants, for the first time, to petition district courts directly for compassionate release. *Id.* Under the old regime, defendants could petition only the BOP Director, who could then make a motion, at his or her discretion, to the district court. *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.4 (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.]. The Director rarely did so. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

### A. *Exhaustion*

The First Step Act's gate-keeping provision created two ways for a defendant to bring a compassionate release motion to a district court. The defendant may file a motion once he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the

defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*."[1] § 3582(c)(1)(A) (emphasis added). With this second path, the statute's plain text states only that thirty days must past after the defendant requests compassionate release from the warden. No more. *United States v. York*, No. 3:11-CR-76, 2019 WL 3241166, at *5 (E.D. Tenn. July 18, 2019). Thus, while § 3582(c)(1)(a)'s gate-keeping provision often is described as an "exhaustion" requirement, it is not "an exhaustion requirement in the traditional sense . . . as it allows a defendant to come to court before the agency has rendered a final decision." *United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.).

Here, Defendant has satisfied the statute's gate-keeping provision because thirty days have passed since Defendant filed a petition for compassionate release with his warden. ECF No. 165 at 5. The Government makes no argument to the contrary. *See* ECF No. 167. Thus, Defendant has satisfied the statute's gatekeeping provision and the Court may address the merits.

B. *Extraordinary and Compelling Reasons*

Compassionate release provides a path for defendants with "extraordinary and compelling reasons" to leave prison early. § 3582(c)(1)(A)(i). Such a sentence reduction must comply with the 18 U.S.C. § 3553(a) factors and "applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A).

---

[1] "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise. . . ." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). And as in *Reiter*, "here it does not." *Id.*; *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2130 (2016) (Thomas, J., dissenting). This is so because the phrase "*whichever* is earlier" makes clear that full exhaustion and "the lapse of 30 days" constitute two distinct paths to federal court. § 3582(c)(1)(A) (emphasis added).

1. Definitions

Congress never defined what constitutes "extraordinary and compelling." 28 U.S.C. § 994(t). Instead, the statute directed the Commission to promulgate "the criteria to be applied and a list of specific" extraordinary and compelling examples. *Id.* Before the First Step Act, the Commission provided just three such examples, none of which apply here.[2]

The Commission also provided a catch-all provision that allows the BOP Director to determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." § 1B1.13 cmt. n.1(D). That still begs the question: what is extraordinary and compelling?

Congress and the Commission gave two guideposts. Extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing." § 1B1.13 cmt. n.2. For example, just because a judge believes a defendant will dramatically improve himself while incarcerated, that does not mean she cannot deem such improvement extraordinary and compelling. And although "rehabilitation . . . is not, *by itself*, an extraordinary and compelling reason," its mention by the Commission and Congress indicate rehabilitation may be considered with other factors. *See* § 1B1.13 cmt. n.3 (emphasis added); *see also* § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

---

[2] First, the defendant's medical condition is such that he suffers from a "terminal illness" or the condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13 cmt. n.1(A).
  Second, "[t]he defendant (i) is at least [sixty-five] years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least [ten] years or [seventy-five] percent of his or her term of imprisonment, whichever is less." § 1B1.13 cmt. n.1(B).
  Third, the defendant's family circumstances include either "(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." § 1B1.13 cmt. n.1(C).

Courts otherwise are left to themselves because the Commission, for whatever reason, never updated its policy statement, as statutorily required, for the First Step Act.[3] Rather, the outdated policy statement still assumes compassionate release "may be granted only upon motion by the Director of the Bureau of Prisons." § 1B1.13 cmt. n.4. This left district courts in a conundrum. On the one hand, Congress unequivocally said it wishes to "[i]ncreas[e] the [u]se . . . of [c]ompassionate [r]elease" by allowing district courts to grant petitions "consistent with *applicable* policy statements" from the Commission. § 3582(c)(1)(A) (emphasis added). On the other hand, the Commission—unable to take any official action—has not made the policy statement for the old regime applicable to the new one.

Many courts, including this one, have concluded this means the Commission lacks an applicable policy statement regarding when a court can grant compassionate release. *United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL 2091802, at *6 (S.D. Iowa Apr. 29, 2020); *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22, 2020) (citing thirteen such cases). In the absence of an applicable policy statement, these courts conclude "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief." *Cantu*, 2019 WL 2498923, at *5; *see also United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts"). The result is that the district court can

---

[3] The Commission cannot amend its guidelines until it again has four voting commissioners. *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *1 n.1 (S.D. Tex. June 17, 2019) (quoting *United States v. Handerhan*, No. 1:10-CR-00298, 2019 WL 1437903, at *1 n.4 (M.D. Pa. Apr. 1, 2019)). The Commission still has only two voting members. *About the Commissioners*, U.S. Sentencing Comm'n, https://www.ussc.gov/commissioners (last visited April 23, 2020).

consider anything—or at least anything the BOP could have considered—when assessing a defendant's motion.

The number of courts adopting this position has grown more still as society grapples with the profound penological consequences of COVID-19. *E.g.*, *Rodriguez*, 2020 WL 1627331, at *12. Indeed, this reading now "appears to be the majority position." *United States v. Scott*, No. 17-CR-156, 2020 WL 2508894, at *8 (E.D. Wis. May 15, 2020). It also is safe to say Congress is aware of courts' use of the law during the pandemic. *See* Cong. Research Serv., R46297, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release* 9 (2020).

To be sure, some courts and the Government still maintain that the First Step Act merely allows courts to grant a motion for compassionate release if the BOP Director would have done the same under the Sentencing Guidelines *and* the BOP Program Statement written for the old law. These courts conclude judges may not stray beyond the specific instances listed in § 1B1.13 cmt. n.1 (A)–(C). *E.g.*, *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019). They reason that the Sentencing Commission reserved § 1B1.13 cmt. n.1's residual provision for the BOP Director and only the BOP director. *Id.*

The Court's previous interpretations of the statute bind no one, not even itself. Regardless, the Court declines to alter its reading. Courts assume Congress legislates with the full knowledge of how agencies have interpreted earlier versions of a statute. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (noting Congress has "effectively ratified the FDA's long-held position"). Congress also can "revoke or amend" the Sentencing Commission's guidelines and policy statements at any time. *United States v. Anderson*, 686 F.3d 585, 590 (8th Cir. 2012) (citing *Mistretta v. United States*, 488 U.S. 361, 393–94 (1989)). The U.S. Supreme Court repeatedly has noted that "'the title of a statute and the

heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947)).  Although titles are not dispositive, sometimes they can be "especially valuable."  *Yates v. United States*, 135 S. Ct. 1074, 1090 (2015) (Alito, J., concurring).

Here, Congress knew of the BOP's rare granting of compassionate release petitions.[4] Until 2013, on average, "only [twenty-four] inmates were released each year."  *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).  That number increased to eighty-three inmates between August 2013 and September 2014 following complaints to the BOP from the Inspector General's office.  *Id.*  Since Congress still amended the program following this increase, one can infer Congress thought eighty-three was still insufficient.  Because rather than "effectively ratif[ying]" the BOP's position, Congress sought to overturn it by statute.  *Brown & Williamson Tobacco Corp.*, 529 U.S. at 144.

The Act listed these changes under the title of "Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.  That title is "especially valuable" here. *Yates*, 135 S. Ct. at 1090.  The Court assumes the BOP Director faithfully executes the narrowly drawn policy and program statements related to compassionate release.  Therefore, the only way direct motions to district courts would increase the use of compassionate release is to allow district judges to consider the vast variety of reasons that may be "extraordinary and compelling."

---

[4] The First Step Act's compassionate release provisions originally appeared as a stand-alone bill. Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018).  That bill explicitly sought to "improve the compassionate release process of the Bureau of Prisons."  *Id.*

9

The Court acknowledges the policy arguments to the contrary. Yes, releasing defendants from incarceration is a delicate business—but not any more so than incarcerating them initially. The Court's reading also does not—and, indeed, has not—allowed judges to release any prisoner. The Court recognizes and respects the intricate sentence-adjustment scheme Congress has created. The Court also knows it must still act in harmony with any sentencing policy guidelines that remain applicable and the § 3553(a) factors. § 3582(c)(1)(A). For instance, the need to appropriately punish severe conduct and not introduce sentencing disparities between defendants convicted of similar crimes provide additional limits on a judge's ability to release people from custody. *See* § 3553(a)(2)–(6).

Therefore, if the First Step Act is to increase the use of compassionate release, the most natural reading of § 3582(c) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. Unqualified "deference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role." *Fox*, 2019 WL 3046086, at *3.

2. Defendant's Extraordinary and Compelling Reasons

Courts have found that the unprecedented risks of COVID-19; sentencing disparities from changes in law; and rehabilitation each constitute extraordinary and compelling reasons to grant compassionate release.

a. COVID-19

"Despite their disagreements about the precise definition of 'extraordinary and compelling reasons' justifying compassionate release, many courts over the past two months have agreed that such reasons exist in cases involving defendants whose serious underlying health conditions place them at an elevated risk of infection and death from COVID-19 while in

custody." *United States v. Cotinola*, No. 13-CR-03890-MV, 2020 WL 2526717, at *3 (D.N.M. May 18, 2020). Indeed, the number of courts that have granted compassionate release because of COVID-19 grows by the day. *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *9 (W.D.N.Y. Apr. 22, 2020); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020); *United States v. Hernandez*, No. 18 CR. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020); *Rodriguez*, 2020 WL 1627331, at *1; *United States v. Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020); *United States v. Campagna*, No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020).

COVID-19 poses a particular risk for individuals with certain existing health conditions. These include a compromised immune system and liver problems. *Groups at Higher Risk for Severe Illness*, Ctrs. for Disease Control & Prevention (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

Indeed, several courts have cited a weakened immune system as a basis for granting compassionate release. *Campagna*, 2020 WL 1489829, at *1 (noting the fifty-five-year-old defendant "suffers from a compromised immune system . . . put[ting] him at significant risk if he were to become infected with the current Coronavirus"); *Jepsen*, 2020 WL 1640232, at *3. Courts also have granted release to defendants suffering from hepatitis C, among other conditions. *E.g.*, *Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084, at *1 (E.D. Mich. Apr. 9, 2020).

Here, Defendant's medical records and presentence investigation report show he suffered from hepatitis C for decades. ECF No. 167 at 6. Defendant claims he has scarring on his liver, ECF No. 158-1, and points to authorities showing that long-term hepatitis C infections weaken

the immune system, Trinity Coll. Dublin, *How Hepatitis C 'Ghosts' Our Immune System*, Science Daily (June 5, 2019), https://www.sciencedaily.com/releases/2019/06/190605105940.htm.  The Government does not dispute the health risks, but argues Defendant was cured in 2018.  ECF No 167-1.  Even so, the Government's materials show liver damage may persist even after the virus appears defeated.  ECF No. 167-2 (noting there is no "guarantee that the liver will heal from existing scarring or damage.  There may still be liver-related complications if you have advanced liver scarring or cirrhosis").  Furthermore, it is not at all clear one's immune system simply rebounds from a long-term hepatitis C infection.  Benedikt Strunz et al., *Chronic Hepatitis C Virus Infection Irreversibly Impacts Human Natural Killer Cell Repertoire*, 9 Nature Comm. 2275 (2018), https://www.nature.com/articles/s41467-018-04685-9; *see also Immune System Does Not Recover Despite Cured Hepatitis C Infection*, Karolinska Inst. (June 11, 2018), https://news.ki.se/immune-system-does-not-recover-despite-cured-hepatitis-c-infection.

At bottom, Defendant credibly claims two conditions—a weakened immune system and a damaged liver—that the Centers for Disease Control and Prevention linked to COVID-19 complications.  The Court will not brush off those concerns as just another downside of prison.  No person deserves such callousness.

The Government notes there indeed are far fewer infections among federal prisoners than Americans at large.  ECF No. 167 at 9.  Fair enough, but there also are far fewer Americans inside federal prisons than outside of them.  Simple math shows the former category is far more likely to have a confirmed case of the virus, even with BOP's limited testing.[5]  And although

---

[5] There have been 2265 confirmed cases among 149,648 federal prisoners, representing 1.51% of the population.  *COVID-19 Cases*, Fed. Bureau Prisons (May 21, 2020), https://www.bop.gov/coronavirus/.  Meanwhile, there have been 1,551,853 confirmed cases among roughly 329,672,928 Americans, representing 0.471% of the population.  *Compare Mortality Analysis*,

FMC Rochester has confirmed just one case among staff, that also demonstrates that even a federal medical facility is unable keep the virus outside of its walls.  Thus, the particularized risks of COVID-19 cut in favor of extraordinary and compelling reasons supporting compassionate release.[6]

    b.  Rehabilitation

As discussed above, "[r]ehabilitation of the defendant *alone* shall not be considered" sufficiently extraordinary and compelling to justify compassionate release.  § 994(t) (emphasis added).  For the word "alone" to do any work—as it must—that means courts can consider rehabilitation as *part* of a compassionate release motion.  *Cf. Corley v. United States*, 556 U.S. 303, 314 (2009) (stating that a "statute should be construed so that effect is given to all its provisions" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))).  Several courts, including this one, have concluded the same and considered a defendant's rehabilitation in granting compassionate release.  *E.g.*, *Brown*, 2020 WL 2091802, at *7; *United States v. Wade*, No. 2:99-CR-00257-CAS-3, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020); *United States v. Chan*, No. 96-CR-00094-JSW-13, 2020 WL 1527895, at *6 (N.D. Cal. Mar. 31, 2020); *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *3 (D. Kan. Mar. 11, 2020).

Defendant has done remarkably well during more than fifteen years of incarceration.  He has earned an associate degree, met or exceeded expectations in his jobs, and "has been very active" in BOP programming.  ECF No. 157-1 at 2.  He meanwhile maintained a clear

---

Johns Hopkins U. & Med. (May 21, 2020, 5:46 AM), https://coronavirus.jhu.edu/data/mortality, *with U.S. and World Population Clock*, U.S. Census Bureau, https://www.census.gov/popclock/ (last visited May 21, 2020).

    [6] The Court does not hold that every federal inmate with a COVID-19 risk factor necessarily meets the criteria for compassionate release.  *See, e.g.*, *United States v. Starr*, No. 4:06-CR-00080, 2020 WL 2312045, at *1 (S.D. Iowa May 8, 2020).  Rather, a prisoner's specific COVID-19 risk is but one factor, like rehabilitation, that can cut in favor of compassionate release.

disciplinary record, no minor feat in any prison. *Id.* And he appears to have taken on such self-improvement for its own sake, not any hoped reward. For instance, he completed a 500-hour Residential Drug Abuse Program that would normally lead to a sentence reduction despite being unable to receive one because of his crime's specific offense characteristics. ECF No. 165 at 13. This also is his first post-conviction motion to the Court. Thus, Defendant's exemplary rehabilitation cuts in favor of release as well.

    c. Sentencing Disparity

Several courts, including this one, also have held that sentencing disparities created by criminal law reforms can be considered as part of a compassionate release motion. *Brown*, 2020 WL 2091802, at *8 (holding changes to mandatory minimum sentence calculations for violations of 18 U.S.C. § 924(c) constitute one of several extraordinary and compelling reasons); *United States v. McPherson*, No. CR94-5708RJB, 2020 WL 1862596, at *5 (W.D. Wash. Apr. 14, 2020) ("It is extraordinary that a civilized society can allow this to happen to someone who, by all accounts, has long since learned his lesson."); *Wade*, 2020 WL 1864906, at *4; *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020) (considering § 924(c) amendments). In some cases, the government appears to have accepted these decisions. *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019) ("A reduction in his sentence is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed."), *appeal dismissed following government request*, No. 20-1603 (8th Cir. April 1, 2020).

Here, Defendant may be out of prison if the law was in 2006 what it is now. Back then, Defendant faced a twenty-year mandatory minimum under § 841(b)(1)(A) because he committed

his offense with a prior drug conviction. ECF No. 166 ¶¶ 105–06. However, Congress has since reduced the mandatory minimum for violating the same statute with a prior drug conviction to fifteen years. *See* § 841(b)(1)(A). Defendant has been in custody since February 2005, more than fifteen years ago, and federal inmates—especially those with rehabilitative records like Defendant's—often transition out of prison during their last year. *See* ECF No. 20.

The Court is sensitive to the fact that retroactivity for sentencing calculations generally is the Legislature's province. But Congress already has shown how factors that cannot be an "extraordinary and compelling reason" alone can still be considered with other factors. *See* § 994(t). Thus, the Court can still consider the resulting sentencing disparity as part of a motion for compassionate release. And if this is so, it is hard to argue that the unfairness of keeping a man in prison for years more than if he had committed the same crime today is neither extraordinary nor compelling. This, too, cuts in favor of a sentence reduction under § 3582(c).

To be sure, Defendant does not fit in one of the three categories that once formed the heartland of compassionate release cases. He is not terminally ill, at least not yet. He is not older than sixty-five. Although his son requires support, he is an adult and receives aid from the state. *See* § 1B1.13 cmt. n.1(A)–(C). But Congress recognized these three categories created by the Sentencing Commission were insufficient when it sought to open compassionate release to more inmates. And regardless, even the Commission realized there would be "extraordinary and compelling" cases that fell outside the heartland. Defendant's unique health risks, rehabilitation, and greater-than-necessary sentence constitute extraordinary and compelling reasons.

### C.  *§ 3553(a) Factors*

Finally, the Court must consider if compassionate release comports with any applicable § 3553(a) factors. § 3582(c)(1)(A). To be sure, the "nature and circumstances of the offense"

are serious, if not unique in the Southern District of Iowa. § 3553(a)(1). Defendant pleaded guilty to producing a not insignificant amount of methamphetamine. ECF No. 166 ¶ 1.

And with respect to "characteristics of the defendant," § 3553(a)(1), this also was not his first offense. Yet those previous offenses occurred in Defendant's early twenties. *Id.* ¶¶ 50–60. Defendant is now forty-nine years old. From this case's beginning, he owned up to his crime. Meanwhile, his exemplary rehabilitative progress in prison, discussed above, suggests he is a different person today. Now, he seeks to return home not just for his own safety, but to help care for his autistic son while his wife manages her own liver problems. ECF No. 157 at 1.

Meanwhile, the "need for the sentence imposed" appears weak after fifteen years of incarceration. § 3553(a)(2). Congress, by amending § 841(b)(1)(A), already made clear that the "seriousness of the offense" does not automatically warrant more than fifteen years in prison. And given Defendant's spotless prison disciplinary record, incarceration is unnecessary "to protect the public from further crimes of the defendant." § 3553(a)(2)(C). Meanwhile, Defendant's exhaustive use of prison programming and employment suggests an actual vocation—outside of prison—would best "provide the defendant with needed educational or vocational training." § 3553(a)(2)(D).

Incarceration also is not the only "kind[] of sentence available." § 3553(a)(3). Noncustodial sentences also curtail "prized liberty interests" and "the Defendant always faces the harsh consequences that await if he violates the conditions" attached to such a sentence. *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005), *rev'd*, 446 F.3d 884 (8th Cir. 2006), *rev'd*, 552 U.S. 38 (2007). Such restrictions also promote respect for the law, protect the public, and do not constitute any endorsement of Defendant's conduct. *See id.*

Although it is true the Sentencing Commission's Guidelines, counseled in favor of a longer sentence, they are but one factor. *See* § 3553(a)(4). And because the Commission never released guidelines with respect to compassionate release under the First Step Act, *see supra* note 3, § 3553(a)(5)'s "pertinent policy statement" factor is neutral.

Considering these factors in combination with the extraordinary and compelling reasons discussed above, the Court grants Defendant's motion for compassionate release.

D.  *Release Plan*

Defendant's term of imprisonment is reduced to time served, and he is sentenced to a term of supervised release that runs until his current release date plus the ten-year term imposed at sentencing. The term of supervision is subject to conditions in the original judgment. In addition, Defendant shall reside at the home of his sons, Brandon and Austin Stephenson, at 2113 Burlington Avenue, in Burlington, Iowa. The U.S. Probation and Pretrial Services Office (USPO) must approve any address change.

Upon release, Defendant shall immediately contact the Southern District of Iowa's USPO. He shall submit to USPO screening for COVID-19 following his release to the extent it is available. He also shall remain in self-quarantine for fourteen days upon returning home. He shall comply with national, state, and local orders regarding COVID-19.

III.  CONCLUSION

For the reasons stated herein, Defendant's pro se Motion for Compassionate Release (ECF No. 157) is GRANTED.

IT IS SO ORDERED.

Dated this 21st day of May 2020.

*/s/ Robert W. Pratt*
ROBERT W. PRATT, Judge
U.S. DISTRICT COURT